**GLANCY PRONGAY & MURRAY LLP**
LIONEL Z. GLANCY (#134180)
ROBERT V. PRONGAY (#270796)
LESLEY F. PORTNOY (#304851)
1925 Century Park East, Suite 2100
Los Angeles, CA 90067
Telephone: (310) 201-9150
Facsimile: (310) 201-9160
Email: lglancy@glancylaw.com

*Attorneys for Plaintiff*
[Additional Counsel Listed On Signature Page]

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| NICK COHENMEYER, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>BLACKHAWK NETWORK HOLDINGS, INC., ANIL D. AGGARWAL, RICHARD H. BARD, THOMAS BARNDS, STEVEN A. BURD, ROBERT L. EDWARDS, MOHAN GYANI, PAUL HAZEN, ROBERT B. HENSKE, TALBOTT ROCHE, ARUN SARIN, WILLIAM Y. TAUSCHER, and JANE J. THOMPSON,<br><br>Defendants. | Case No.:<br><br>**CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br>**JURY TRIAL DEMANDED** |

CLASS ACTION COMPLAINT

Plaintiff Nick Cohenmeyer ("Plaintiff"), by and through his attorneys, alleges the following on information and belief, except as to the allegations specifically pertaining to Plaintiff, which are based on personal knowledge.

**NATURE OF THE ACTION**

1. This action stems from a proposed transaction announced on January 16, 2018 (the "Proposed Transaction" or "Merger"), pursuant to which Blackhawk Network Holdings, Inc. ("Blackhawk" or the "Company") will be acquired by private equity firm Silver Lake Partners ("Silver Lake") and hedge fund P2 Capital Partners ("P2") (collectively, the "Acquirers").

2. On January 15, 2018, Blackhawk's Board of Directors (the "Board" or the "Individual Defendants") caused the Company to enter into an agreement and plan of merger (the "Merger Agreement") with the Acquirers. Pursuant to the terms of the Merger Agreement, the Acquirers will purchase each issued and outstanding share of Blackhawk common stock for $45.25 in cash (the "Merger Consideration").

3. The success of the Merger is conditioned on Blackhawk receiving the "yes" vote of the holders of a majority of its outstanding shares of common stock, approximately 6.68% of which are already either voluntarily committed to doing so (the case with respect to each of Blackhawk's directors and executive officers, who collectively beneficially own approximately 1.23% of Blackhawk's outstanding common stock as of February 28, 2018), or are locked up pursuant to voting and support agreements executed with the Company (the case with respect to P2, which beneficially owns approximately 5.38% of the Company's outstanding common stock as of February 28, 2018). The vote on the Merger is scheduled to take place on March 30, 2018.

4. On March 2, 2018, Defendants filed a definitive proxy statement on Schedule 14A (the "Proxy") with the United States Securities and Exchange Commission ("SEC") in connection with the Proposed Transaction. As described herein, the Proxy omits material information with

respect to the Proposed Transaction, which renders it false and misleading, in violation of Sections 14(a) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78n(a), 78t(a), and SEC Rule 14a-9, 17 C.F.R. 140.14a-9 ("Rule 14a-9") promulgated thereunder.

5. Plaintiff seeks to enjoin Defendants from taking any steps to consummate the Proposed Transaction or, in the event the Proposed Transaction is consummated, to recover damages resulting from the Defendants' wrongdoing described herein.

## JURISDICTION AND VENUE

6. This Court has subject matter jurisdiction over all claims asserted herein pursuant to Section 27 of the Exchange Act, 15 U.S.C § 78aa, and 28 U.S.C. § 1331, as Plaintiff alleges violations of Sections 14(a) and 20(a) of the Exchange Act.

7. This Court has personal jurisdiction over all of the Defendants because each is either a corporation that conducts business in, and maintains operations within, this District, or is an individual who is either present in this District for jurisdictional purposes or has sufficient minimum contacts with this District so as to make the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

8. Venue is proper under 28 U.S.C. § 1391 because a substantial portion of the transactions and wrongs complained of herein occurred in this District.

## PARTIES

9. Plaintiff is, and has been continuously throughout all times relevant hereto, the owner of Blackhawk common stock.

10. Defendant Blackhawk is a Delaware corporation, with its principal executive offices located in Pleasanton, California. Blackhawk's common stock is listed on the NASDAQ under the symbol "HAWK."

11. Defendant William Y. Tauscher ("Tauscher") has served as the Chairman of the Board since 2009 and as a Board member since 2007. Tauscher previously served as the Company's Chief Executive Officer ("CEO") between August 2010 and February 2016.

12. Defendant Talbott Roche ("Roche") is Blackhawk's CEO and President, and has served as such since February 2016 and November 2010, respectively. Roche has served as a Board member since 2016.

13. Defendant Anil D. Aggarwal ("Aggarwal") has served as a Board member since 2016.

14. Defendant Richard H. Bard ("Bard") has served as a Board member since 2014.

15. Defendant Thomas Barnds ("Barnds") has served as a Board member since 2017.

16. Defendant Steven A. Burd ("Burd") has served as a Board member since 2007.

17. Defendant Robert L. Edwards ("Edwards") has served as a Board member since July 2008, and previously served on the Board from January 2006 to August 2007.

18. Defendant Mohan Gyani ("Gyani") has served as a Board member since 2007.

19. Defendant Paul Hazen ("Hazen") has served as a Board member since 2007.

20. Defendant Robert B. Henske ("Henske") has served as a Board member since 2017.

21. Defendant Arun Sarin ("Sarin") has served as a Board member since 2009.

22. Defendant Jane J. Thompson ("Thompson") has served as a Board member since 2014.

23. The defendants listed in ¶¶ 11-22 are collectively referred to herein as the "Individual Defendants."

24. Non-Party Silver Lake is a private equity firm that specializes in technology investing. Silver Lake has approximately $39 billion in combined assets under management and committed capital. Silver Lake's current portfolio of investments includes Alibaba Group,

Ancestry, Broadcom Limited, Cast & Crew, Ctrip, Dell Technologies, Endeavor, Fanatics, Global Blue, GoDaddy, Motorola Solutions, Red Ventures, Sabre, SoFi, SolarWinds and Symantec.

25. Non-Party P2 is a New York-based hedge fund that manages a concentrated portfolio of significant ownership stakes in public companies in which it is an active shareholder focused on creating long-term value in partnership with management. P2's limited partners include leading public pension funds, corporate pension funds, endowments, foundations, insurance companies, and high net worth investors.

## SUBSTANTIVE ALLEGATIONS

26. Blackhawk is a global financial technology company that specializes in the sale of prepaid products, such as gift cards, to consumers at its retail distribution partners and online and the sale of telecom handsets to retail distribution partners for resale to consumers. The Company's Hawk Commerce division offers technology solutions to businesses and direct to consumers. Its Hawk Incentives division offers enterprise, business and reseller partners an array of platforms and branded value products. Blackhawk operates in 26 countries.

27. Although the Proxy provides Blackhawk's stockholders with an overview of the Proposed Transaction, it omits certain critical information, which renders portions thereof materially incomplete and/or misleading, in violation of the Exchange Act provisions discussed herein. As a result, Blackhawk's stockholders lack material information necessary to allow them to make an informed decision when voting on the Merger.

28. In particular, the Proxy contains materially incomplete and/or misleading information concerning, *inter alia*: (i) potential conflicts of interest that may have tainted the Merger negotiation and sales process; and (ii) the valuation analyses performed by Blackhawk's financial advisor, Sandler O'Neill & Partners, L.P. ("Sandler"), in support of its fairness opinions, including certain of the projections upon which it relied.

*Material Omissions Concerning Potential Conflicts of Interest that May have Tainted the Merger Negotiation and Sales Process*

29. The Proxy fails to disclose material information regarding potential conflicts of interest that may have tainted Merger negotiation and sales process.

30. The Proxy does not disclose whether, and if so, which, Blackhawk's executive officers, directors, and management will remain employed with the post-Merger entity after completion of the Merger.[1] Nor does the Proxy indicate whether any employment related discussions or negotiations occurred between the Acquirers and such individuals during the Merger negotiations, which could have potentially tainted the sales process. Although the Proxy states that "Parent or its affiliates may enter into other compensation or benefits arrangements with employees of Blackhawk that are effective following the effective time," and that "the terms of such equity incentive plan or any other post-closing compensation or benefits arrangements have not been agreed or otherwise determined as of the date of this proxy statement," Proxy at 52, this does not rule out the possibility that communications regarding post-closing compensation or benefits arrangements took place during the sales process, even if formal agreements on terms were not finalized during that time. Communications regarding post-transaction employment and Merger-related benefits during the negotiation of the underlying transaction must be disclosed to stockholders, as they would indicate potential conflicts of interest.

31. The plausibility of the existence of such conflicts of interest is bolstered by the fact that, as some courts have recognized, in the context of a going private transaction with a private

---

[1] The January 16, 2018 Press Release announcing the Merger states that, "[u]pon completion of the transaction[,] Blackhawk will operate as a private company under the leadership of the current management team." However, the Press Release does not specify exactly which members of the management team will be remaining with the post-Merger entity, and it mentions nothing about Blackhawk's other directors and officers. The Proxy states that, "[i]t is expected that upon or following the effective time, Parent will establish a new equity incentive plan for certain employees of Blackhawk." Proxy at 52. This qualified statement does not specify who will remain employed, if anyone.

equity acquirer—such as the instant transaction—members of the target company's management are inherently susceptible to becoming conflicted by the prospect of obtaining lucrative employment and/or equity interests in the post-Merger entity.

32. The Proxy also provides that the Board decided not to solicit other proposals (than that made by the Acquirers) to acquire the Company during the Merger negotiation and sales process. Proxy at 31. Instead, the Board opted for a 25-day "go-shop" period following the announcement of the Proposed Transaction with the Acquirers. According to the Proxy, at some point during the "go-shop" period, Sandler contacted eight strategic entities and five additional financial sponsors "that it believed might have an interest in making a proposal to acquire the Company." Proxy at 33. "None of these parties indicated that they were interested in engaging with the Company during the go-shop period." *Id*. However, the Proxy does not disclose *when* during the "go-shop" Sandler contacted these 13 potential acquirers. This would be material to shareholders, as there is the potential that Sandler did not reach out until the last day or hour of the "go-shop," which could indicate that the Board shirked its responsibilities to shareholders and was conflicted by its allegiance to the Acquirers.

33. Other than the group of 13 potential acquirers that Sandler contacted at some point during the "go-shop," another interested acquirer, Party A, indicated its interest in a transaction with Blackhawk. Party A initially contacted Defendant Roche by email in early January 2018 and expressed its interest in pursuing discussions regarding its acquisition of the Company. Proxy at 31. At that time, Defendant Roche responded to Party A that she would "follow-up . . . shortly." *Id*. Approximately one week later, the Board decided not to pursue the contact with Party A. Proxy at 32. The Proxy states that one reason for this decision was that "Party A had not indicated a price, or even a range of prices, at which it would be willing to acquire the Company . . . ." *Id*. However, the Proxy does not disclose whether Party A was ever given the opportunity to present a

price to acquire the Company. It emailed Defendant Roche to begin a dialogue and was told to wait for a follow-up, which apparently never came. This indicates that the Board's stated reason for not negotiating with Party A at this time could have been a pretext.

34. *After* the Merger Agreement was signed and the Company publicly announced the Merger, Party A contacted the Company again to indicate its interest in engaging with the Company during the "go-shop" period to negotiate a potential alternative acquisition. Proxy at 33. According to the Proxy, Party A executive a confidentiality agreement with the Company the day after the announcement of the Merger. However, the Proxy does not disclose the terms of the confidentiality agreement, including whether it permitted Company A to make an unsolicited offer to acquire the Company if it were unable to work out a deal during the 25-day "go-shop" period, or whether it contained a standstill provision and whether the standstill had a don't-ask-don't-waive ("DADW") provision.[2]

35. The disclosure of the information discussed in ¶¶ 30-34, above, would be material to Blackhawk's shareholders, as they need to be fully informed about whether their fiduciaries have put in place restrictive devices to foreclose a topping bid for the Company with respect to certain, non-favored, acquirers.

*Material Omissions Concerning Sandler's Valuation Analyses*

36. A financial advisor's opinion of a proposed transaction is one of the most important process-based underpinnings of a board's recommendation of a transaction to its stockholders. Thus, it is imperative for stockholders to be able to understand what factors might influence a financial advisor's analytical efforts.

---

[2] A DADW provision prohibits a potential acquirers from even *asking* the target to waive a standstill prohibition to allow it to submit a topping bid. Several courts have noted that DADW provisions violate a target board's duty to act reasonably, in an informed matter, and in furtherance of the goal of seeking the highest possible sales price, and therefore have ordered injunctive relief when a danger existed that such clauses prevented superior bids from arising.

37. During the summer of 2017, Blackhawk's management prepared Company financial forecasts for fiscal years 2017 through 2020 (the "Initial Projections"), which were provided to Sandler, the Board, and the Acquirers. Proxy at 38. The initial projections included the following financial metrics during that time period: (1) Adjusted EBITDA; (2) Adjusted Operating Revenues; (3) Adjusted Net Income; and (4) Adjusted Earnings Per Share. *Id*.

38. In November 2017 and December 2017, respectively, Blackhawk's management prepared revised Company financial forecasts of Adjusted EBITDA for fiscal year 2018 (the "Intermediate Projections"), but the Proxy does not indicate that the Intermediate Projections included revised management forecasts for the additional financial metrics or fiscal years included in the Initial Projections. *Id*. at 38-39.[3]

39. In January 2018, Blackhawk's management prepared another set of revised Company financial forecasts (the "Revised Projections"), which were provided to Sandler, the Board, and the Acquirers. *Id*. The Proxy's summary of the Revised Projections discloses only a single forecasted value for Adjusted EBITDA for fiscal year 2017 and a range of Adjusted EBITDA for fiscal year 2018. *Id*. at 39. As with the Intermediate Projections, the Proxy does not indicate that the Revised Projections included revised management forecasts for the additional financial metrics or fiscal years included in the Initial Projections.[4]

40. The Proxy states that "Blackhawk's management directed Sandler O'Neill to use the Revised Projections, rather than the Initial Projections . . . for purposes of its [fairness] opinion . . . based on management's view that the Revised Projections were significantly more likely to reflect the future business performance of the Company on a standalone basis . . . ." Proxy at 38.

---

[3] If such additional forecasts were created, the Proxy should disclose that fact and the forecasts, and its failure to do so is a material omission.

[4] If such additional forecasts were created, the Proxy should disclose that fact and the forecasts, and its failure to do so is a material omission.

Indeed, that is what Sandler did. *Id*. at 41 ("In preparing its analyses, Sandler O'Neill used internal estimated adjusted EBITDA for Blackhawk for the year ending December 31, 2017 and adjusted EBITDA range for Blackhawk for the year ending December 31, 2018, all as provided by the senior management of Blackhawk.").

41. However, given the fact that (as just discussed) the Revised Projections were significantly more limited than the Initial Projections, it is unclear, and the Proxy does not disclose, why Blackhawk's management believed that the Revised Projections were superior, particularly for Sandler to use as a basis for its fairness opinion. The Proxy also fails to disclose why Blackhawk's management did not create revised projections for the other financial metrics and fiscal years included in the Initial Projections.[5]

42. Management's financial projections are considered by courts to be the most important information a stockholder can have when evaluating the proposed consideration in a merger and deciding whether to vote in favor of a merger. Projections are highly material because they enable shareholders to understand the company's intrinsic value and the extent of the market's undervaluation of their company. As described herein, the Proxy's disclosure and discussion of the projections relied upon by the financial advisors is materially incomplete.

43. The Proxy also fails to disclose material information with respect to various financial analyses performed by Sandler in support of its fairness opinion. For example, with respect to Sandler's *Discounted Cash Flow Analysis* ("DCF"), the Proxy (at page 46) fails to disclose certain of the inputs and assumptions underlying Sandler's calculation of the discount rate of 11.27%; the projected results from Grass Roots Meetings & Events Limited and Cardpool, Inc.

---

[5] In sum, although shareholders would know that Sandler was told to use the Revised Projections, and would also know that the Revised Projections were more limited than the Initial Projections, shareholders would not why Sandler was so instructed, or why management did not update the other financial metrics or years of the Initial Projections.

("Grass Roots") that were excluded from the 2017 Adjusted EBITDA estimate and 2018 estimated Adjusted EBITDA range that was used in the DCF[6]; and the basis for assuming a compound annual growth rate range of 5.00%-15.00% for Blackhawk's 2018-2021 EBITDA.[7]

44.  With respect to Sandler's *Comparable Company Analysis*, the Proxy (at page 44) fails to disclose: (i) the individual multiples that Sandler calculated and analyzed for each company it selected as part of its analysis; (ii) why certain of the companies Blackhawk identified in its most recent 10-K as its "competitors," including Visa and MoneyGram, and as companies Blackhawk "face[s] competition from," including First Data Corporation, were not included in the list of competitor companies that Sandler selected for its Comparable Company Analysis; and (iii) why certain of the companies listed in Blackhawk's peer group according to its regular proxy filing (as peers for compensation decisions), including Sabre Corp., Aimia Inc., Henry (Jack) & Associates, Cardtronics PLC, and Black Night Financial Services, were not included in the list of competitor companies that Sandler selected for its Comparable Company Analysis.

45.  With respect to Sandler's *Analysis of Precedent Merger Transactions*, the Proxy (at pages 44-45) fails to disclose the individual multiples and premiums that Sandler calculated and analyzed for each transaction it selected as part of its analysis.

46.  With respect to Sandler's *Public Company Premium Analysis*, the Proxy (at page 45) fails to disclose: (i) the identities of the transactions Sandler selected as part of its analysis; (ii) the individual premiums for each transaction; or (iii) the low and high premiums for the group of transactions.

---

[6] The Proxy also fails to disclose whether Sandler accounted for the financial impact of the sale of Grass Roots on Blackhawk's implied value when performing its valuation analyses.

[7] The Proxy also fails to disclose why Sandler performed a "DCF" Analysis without discounting any projections to present value, which is a highly unusual type of analysis. Instead, Sandler *started* one of its DCF analyses at the Merger Consideration (of $45.25 per share) and then extrapolated current growth rates into the future, which can be much less accurate.

47. The non-disclosed information discussed in ¶¶ 43-46, above, would be material to Blackhawk shareholders in deciding how to vote their shares, as the real informative value of the financial advisor's work is not in its conclusion, but in the valuation analyses that buttresses that result. When a financial advisor's endorsement of the fairness of a transaction is touted to shareholders, the valuation methods used to arrive at that opinion, as well as the key inputs and range of ultimate values generated by those analyses must also be fairly disclosed.

48. The non-disclosed information discussed herein would be material to Blackhawk shareholders in deciding how to vote their shares, as shareholders need to understand the motivations and conflicts that could potentially influence or prevent fiduciaries from acting solely in their best interests and that of the Company. Without the material disclosures discussed above, it is impossible for Blackhawk's shareholders to fully understand and interpret the financial analyses, including their impact on the fairness of the Merger Consideration, as well as to consider the impact of potential conflicts of interest that may have tainted the sales process, when determining whether to vote in favor of the Proposed Transaction.

## CLASS ACTION ALLEGATIONS

49. Plaintiff brings this action as a class action pursuant to Fed. R. Civ. P. 23 on behalf of himself and the other public stockholders of Blackhawk (the "Class"). Excluded from the Class are Defendants herein and any person, firm, trust, corporation, or other entity related to or affiliated with any of the Defendants.

50. This action is properly maintainable as a class action for the following reasons:

   a. The Class is so numerous that joinder of all members is impracticable. As of February 28, 2018, there were 56,805,674 shares of Blackhawk common stock outstanding, held by hundreds, if not thousands, of individuals and entities scattered throughout the country.

      b.      Questions of law and fact are common to the Class, including, among others: (i) whether Defendants have violated Sections 14(a) and 20(a) of the Exchange Act in connection with the Proposed Transaction; and (ii) whether Plaintiff and the Class would be irreparably harmed if the Proposed Transaction is consummated as currently contemplated and pursuant to the Proxy as currently composed.

      c.      Plaintiff is an adequate representative of the Class, has retained competent counsel experienced in litigation of this nature, and will fairly and adequately protect the interests of the Class.

      d.      Plaintiff's claims are typical of the claims of the other members of the Class and Plaintiff does not have any interests adverse to the Class.

      e.      The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual members of the Class which would establish incompatible standards of conduct for the party opposing the Class.

      f.      Questions of law or fact common to class members predominate over any questions affecting only individual members.

      g.      A class action is superior to other available methods for fairly and efficiently adjudicating this controversy.

      h.      Defendants have acted, or refused to act, on grounds generally applicable to the Class as a whole, and are causing injury to the entire Class.  Therefore, preliminary and final injunctive relief on behalf of the Class as a whole is entirely appropriate.

# CAUSES OF ACTION

## COUNT I

### Claim for Violation of Section 14(a) of the Exchange Act and Rule 14a-9 Promulgated Thereunder
### (Against All Defendants)

51. Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

52. Section 14(a)(1) of the Exchange Act makes it "unlawful for any person . . . to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 78l of this title." 15 U.S.C. § 78n(a)(1).

53. Rule 14a-9, promulgated by the SEC pursuant to Section 14(a) of the Exchange Act, provides that solicitation communications with shareholders shall not contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9(a).

54. Rule 14a-9 further provides that, "[t]he fact that a proxy statement, form of proxy or other soliciting material has been filed with or examined by the [Securities and Exchange] Commission shall not be deemed a finding by the Commission that such material is accurate or complete or not false or misleading, or that the Commission has passed upon the merits of or approved any statement contained therein or any matter to be acted upon by security holders. No representation contrary to the foregoing shall be made." 17 C.F.R. § 240.14a-9(b).

55. As discussed herein, the Proxy misrepresented and/or omitted material facts concerning, *inter alia*: the financial analyses performed by Blackhawk's financial advisor in support of its so-called "fairness opinion" that approved the Merger Consideration; and potential conflicts of interest that may have tainted the Merger negotiation and sales process.

CLASS ACTION COMPLAINT
13

56. Defendants prepared, reviewed, filed and disseminated the false and misleading Proxy to Blackhawk shareholders. In doing so, Defendants knew or recklessly disregarded that the Proxy failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

57. The omissions and incomplete and misleading statements in the Proxy are material in that a reasonable shareholder would consider them important in deciding how to vote their shares. In addition, a reasonable investor would view such information as altering the "total mix" of information made available to shareholders.

58. By virtue of their positions within the Company and/or roles in the process and in the preparation of the Proxy, Defendants were undoubtedly aware of this information and had previously reviewed it, including participating in the Merger negotiation and sales process and reviewing the financial advisors' complete financial analyses purportedly summarized in the Proxy.

59. The Individual Defendants undoubtedly reviewed and relied upon the omitted information identified above in connection with their decision to approve and recommend the Merger.

60. Blackhawk is deemed negligent as a result of the Individual Defendants' negligence in preparing and reviewing the Proxy.

61. Defendants knew that Plaintiff and the other members of the Class would rely upon the Proxy in determining whether to vote in favor of the Merger.

62. As a direct and proximate result of Defendants' unlawful course of conduct in violation of Section 14(a) of the Exchange Act and Rule 14d-9, absent injunctive relief from the Court, Plaintiff and the other members of the Class will suffer irreparable injury by being denied the opportunity to make an informed decision as to whether to vote in favor of the Merger.

63. Plaintiff and the Class have no adequate remedy at law.

**COUNT II**

**Claim for Violations of Section 20(a) of the Exchange Act**
**(Against the Individual Defendants)**

64. Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

65. The Individual Defendants acted as controlling persons of Blackhawk within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their positions as officers and/or directors of Blackhawk, and participation in and/or awareness of the Company's operations and/or intimate knowledge of the false statements contained in the Proxy filed with the SEC, they had the power to influence and control and did influence and control, directly or indirectly, the decision making of the Company, including the content and dissemination of the various statements which Plaintiff contends are false and misleading.

66. Each of the Individual Defendants were provided with or had unlimited access to copies of the Proxy and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

67. In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company, and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations alleged herein, and exercised the same. The Proxy contains the unanimous recommendation of each of the Individual Defendants to approve the Proposed Transaction. They were thus directly connected with and involved in the making of the Proxy.

68. As set forth above, the Individual Defendants had the ability to exercise control over and did control a person or persons who have each violated Section 14(a) of the Exchange

Act and Rule 14d-9, by their acts and omissions as alleged herein.  By virtue of their positions as controlling persons and the acts described herein, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.

69. As a direct and proximate result of Individual Defendants' conduct, Plaintiff will be irreparably harmed.

70. Plaintiff and the Class have no adequate remedy at law.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays for judgment and relief as follows:

A. Ordering that this action may be maintained as a class action and certifying Plaintiff as the Class representative and Plaintiff's counsel as Class counsel;

B. Preliminarily and permanently enjoining Defendants and all persons acting in concert with them from proceeding with, consummating, or closing the Proposed Transaction;

C. Directing the Individual Defendants to disseminate a Proxy that does not contain any untrue statements of material fact and that states all material facts required in it or necessary to make the statements contained therein not misleading;

D. In the event Defendants consummate the Proposed Transaction, rescinding it and setting it aside or awarding rescissory damages to Plaintiff and the Class;

E. Directing Defendants to account to Plaintiff and the Class for their damages sustained because of the wrongs complained of herein;

F. Awarding Plaintiff the costs of this action, including reasonable allowance for Plaintiff's attorneys' and experts' fees; and

G. Granting such other and further relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury on all issues so triable.

| | | |
|---|---|---|
| 1 | Dated: March 8, 2018 | **GLANCY PRONGAY & MURRAY LLP** |
| 2 | | |
| 3 | | By: *s/ Lionel Z. Glancy* |
| 4 | | Lionel Z. Glancy<br>Robert V. Prongay |
| 5 | | Lesley F. Portnoy<br>1925 Century Park East, Suite 2100 |
| 6 | | Los Angeles, CA 90067<br>Telephone: (310) 201-9150 |
| 7 | | Facsimile:  (310) 201-9160<br>Email: lglancy@glancylaw.com |
| 8 | | |
| 9 | | **WOLF POPPER LLP**<br>Carl L. Stine |
| 10 | | Robert S. Plosky<br>845 Third Avenue |
| 11 | | Tel: (212) 759-4600 |
| 12 | | Fax: (212) 486-2093<br>Email: cstine@wolfpopper.com |
| 13 | | rplosky@wolfpopper.com |
| 14 | | *Attorneys for Plaintiff* |

## PLAINTIFF CERTIFICATION
## UNDER THE FEDERAL SECURITIES LAWS

I, Nick Cohenmeyer, hereby state:

1.      I have reviewed the complaint against Blackhawk Network Holdings, Inc. ("Blackhawk") and certain of its directors and officers. I have authorized the filing of a complaint and lead plaintiff motion on my behalf.

2.      I am willing to serve as a representative party on behalf of the Class, including providing testimony at deposition and trial, if necessary.

3.      I currently own 151 Blackhawk shares, which I bought on the following dates and for the following per share prices:

| Date | # of shares purchased | # of shares sold | Price per share |
|---|---|---|---|
| 16 NOV 2017 | 1 | | 34.795 |
| 19 DEC 2017 | 50 | | 34 |
| 12 JAN 2018 | 100 | | 36.5 |
| | | | |
| | | | |
| | | | |
| | | | |
| TOTAL | 151 | | 35.66 (AVG) |

4.      I did not purchase these securities at the direction of counsel, or in order to participate in any private action arising under the federal securities laws.

5.      During the three-year period preceding the date of signing this certification, I have not made a motion to serve, and have not served, as a lead plaintiff on behalf of a class in any private action arising under the federal securities laws.

6.      I will not accept any payment for serving as a representative party on behalf of the Class except to receive a pro rata share of any recovery, or as ordered or approved by the Court, including the award to a representative party of reasonable costs and expenses, including lost wages relating to the representation of the Class.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 27 day of February, 2018

By: _____
Nick Cohenmeyer